# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| STEVEN CLABAUGH, II, | : | Case No. 3:18-cv-00140 |
| Plaintiff, | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

### I. Introduction

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a disability, among other eligibility requirements. A "disability" in this context refers to "any medically determinable physical or mental impairment" that precludes an applicant from engaging in "substantial gainful activity." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

Plaintiff Steven Clabaugh, II applied for Disability Insurance Benefits and Supplemental Security Income, asserting that he had been, and continues to be, under a disability, starting on June 1, 2010.[2] Plaintiff's applications and evidence worked their way

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

[2] Different spellings of Plaintiff's last name appear in the record (including Defendant's Memorandum). Plaintiff's attorney spells his client's name "Clabaugh." This spelling is therefore used here.

through preliminary reviews and eventually landed in front of Administrative Law Judge (ALJ) Elizabeth A. Motta. After a hearing, during which Plaintiff and a vocational expert testified, ALJ Motta denied Plaintiff's applications on the ground that he was not disabled. (Doc. #6, *PageID* #s 42-63).

Plaintiff brings the present case contending (in part) that ALJ Motta erred and unreasonably weighed the opinions of his treating psychologist James Moore, Psy. D. He seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner finds no error in the ALJ's decision and asks the Court to affirm rather than remand.

## II.  **Background**

Plaintiff was forty-one years old on his asserted disability onset date. He achieved the equivalence of a high-school education, and he worked in the past as a machine operator and a cabinet assembler. He avows that his "disability centers on a profound decline in his mental health over time." (Doc. #7, *PageID* #3322).

Plaintiff testified during an administrative hearing that he had not been able to work since his back surgery in July 2010. He attempted to return to school, but it didn't work out because he could not sit long enough. This problem, he testified, led to his mental-health decline:

> Since my inability to work or to get educated to find a job which I thought would be plausible in the beginning, my mental health has deteriorated to the point where I'm suicidal. My inability to take care of my children, to do right by them, to do right by my ex-wife pretty much haunts me ….

(Doc. #6, *PageID* #80; *see PageID* #90). Plaintiff struggles with telling his daughter that he can't do certain things with her. As he vividly describes it: "your soul dies a little bit every time you have to tell a little girl that." *Id*. at 90.

Plaintiff "knew [his] options were gone" after he realized his limitations prevented him from continuing in school. *Id*. His depression and suicidal ideation have worsened over time. He has weekly suicidal ideations. When this occurs, he lies in bed and cries. He calls the suicide hotline and Dr. Moore, who will see him that day whether or not he has an appointment. *Id*. at 91. During the two or three years before the ALJ's hearing, Plaintiff called the suicide hotline or Dr. Moore every week. He saw Dr. Moore at least once a week. *Id*. He characterized Dr. Moore as an "absolutely wonderful person." *Id*. at 91. Dr. Moore helped Plaintiff get back on track.

Plaintiff told ALJ Motta that he called the suicide hotline "probably four or five times a month easy." *Id*. at 92. Sometimes by evening, he can pull himself out a little from a bad day. Sometimes a bad day continues into the next day. He testified that a bad day involved "[n]ot a lot of rational thinking. I just—I just don't want to be here no more." *Id*. Such bad days occurred twice a week on average.

Plaintiff reads books and watches TV but does not have any hobbies. *Id*. at 88-89. He goes to church twice a month if he is "lucky." *Id*. at 87. He uses a computer to send emails to family members; he does not play video games on a computer. He does not eat out with friends, family members, or his children. He is divorced and sees his children ever other weekend and every Wednesday.

Plaintiff's medical records disclose that in September 2011, he was psychiatrically

3

hospitalized due to depression accompanied by suicidal ideation. *Id*. at 402-03, 578-79. Two months later, he returned to the emergency room due to confusion. He had been waking up disoriented for five days. *Id*. at 575.

In May 2012, Plaintiff was psychiatrically hospitalized for three days. *Id*. at 410-20, 546-50. He had attempted self-harm and suicide by stabbing himself with a butcher knife, causing a "superficial" wound. *Id*. Hospital notes state, "He was referred for hospitalization because he is depressed, upset, irritable and angry, and he threatened suicide as well as attempted to harm himself." *Id*. at 410. He was placed on close observation, provided medications, and scheduled for therapy. *Id*.

Plaintiff's third psychiatric hospitalization occurred in May 2014. *Id*. at 480-86, 1318. He was transported to the hospital by squad because he felt hopeless and suicidal (at home). He remained hospitalized for three days. Shortly after his hospital discharge, he underwent a psychiatric evaluation at Darke County Recovery Services. *Id*. at 489-506. He reported thoughts of suicide and ongoing depression related primarily to his chronic back pain. *Id*. at 489, 500-01.

Plaintiff's next hospitalization began in January 2015 in part because he fractured his wrist. *Id*. at 713-71. This occurred after he called the police and threatened to jump off a thirty-foot bridge. *Id*. at 725. At some point, he fell ("jumped or slipped," *id*. at 756) from the bridge. Emergency personnel took him to the hospital. *Id*. His injured left wrist required surgery with fixation. *Id*. at 756, 770-71.

In July 2015, Plaintiff went to Wayne Healthcare again reporting severe depression with suicidal thoughts. *Id*. at 1139-42, 1734-35. He was transferred to Kettering Behavioral

4

Health for further inpatient psychiatric treatment. *Id*. at 2315-18.

Plaintiff was psychiatrically hospitalized for four days in April 2016 for worsening depression with suicidal ideation. *Id*. at 2919, 3277-88. Following this hospitalization, Plaintiff returned to Drake County Recovery Services for outpatient counseling and medication management. *Id*. at 3295-3300. He was diagnosed with severe major depressive disorder recurrent episode. *Id*. at 3301.

Plaintiff also received mental-health treatment from psychologist James Moore, Psy. D., from December 2014 through at least September 2016.[3] *See id*. at 1996-2037, 2328-59, 3290-93. During their initial consultation, Plaintiff reported significant depression with suicidal thoughts. Dr. Moore diagnosed "major depression, recurrent episode moderate." *Id*. at 1996. At various times during treatment with Dr. Moore, Plaintiff presented with mental-status abnormalities such as tense motor behavior, fair insight, lability, flat affect, slowed speech, distractibility, and/or depressed mood. *See id.* at 1998-99, 2001, 2003, 2005, 2008-09, 2011, 2013, 2015, 2017-18, 2022, 2026-27, 2033-36, 2334, 2342-44, 2348-50, 2356, 3290-92. He continued to often report suicidal thoughts. *See id.* at 1998, 2001-02, 2005, 2007-11, 2013, 2015, 2017-18, 2020-23, 2025-32, 2034-36, 2330-32, 2336-44, 2348-56.

In September 2015, Dr. Moore diagnosed Plaintiff with "Major Depression, Recurrent, Moderate-Severe." *Id*. at 2038. Dr. Moore noted that Plaintiff engaged in

---

[3] Plaintiff refers to Dr. Moore as a psychiatrist but it appears that he does not hold an M.D. His Psy.D. earns him the title of psychologist.https://www.verywellmind.com/psychologists-vs-psychiatrists-what-is-the-difference-2795761

5

constant suicidal ideation, and he is "ashamed he has to depend upon others. [His] children are his main motivation for living." *Id*. at 2039. Dr. Moore explained that Plaintiff "has already attempted suicide once. [He] will be of particular risk when his kids get older or if he feels he has nothing to contribute. [He] has made gains in last months despite pain from a chronic renal problem." *Id*.

In September 2015, Dr. Moore completed a questionnaire stating his opinion that Plaintiff's impairments or treatments would cause him to be absent from work more than three times a month. *Id*. at 2040. Dr. Moore also opined that Plaintiff had extreme limitations in his ability to perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek. *Id*. Dr. Moore thought Plaintiff had marked limitations in ability to concentrate or persist, resulting in a failure to complete tasks in a timely manner. And Dr. Moore noted marked limitations in Plaintiff's ability to carry out very detailed instructions and his ability to maintain attention and concentration for extended periods of time. *Id*.

### III. <u>Standard of Review and ALJ Motta's Decision</u>

Review of ALJ Motta's decision considers whether she applied the correct legal standards and whether substantial evidence supports her findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance…." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.), *Report & Recommendations adopted*, 2018 WL

3549787, at *1 (S.D. Ohio 2018) (Rice, D.J.).

The ALJ reviewed the evidence and evaluated Plaintiff's disability status under a each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. §§ 404.1520, 416.920.[4] Her more pertinent findings began at steps two and three where she found that Plaintiff had severe impairments—lumbar degenerative disc disease, depressive disorder, history of polysubstance abuse—and that his impairments did not automatically qualify him for benefits. (Doc. #6, *PageID* #47-54).

At step four, the ALJ concluded that the most Plaintiff could do (his residual functional capacity, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of "light work" with many limitations. She found, for example:

> The claimant can stand/walk as much as four hours a day combined total during an eight-hour workday. He can sit up to six hours in an eight-hour workday…. [He] is limited to performing simple, repetitive tasks involving low-stress duties (i.e., no strict production quotas or fast pace and only routine work with few changes in work setting). [He] should have only occasional contact with the public, co-workers, and supervisors, including no teamwork or over-the shoulder supervision.

*Id*. at 55.

The ALJ concluded at step five that there were many full-time jobs Plaintiff could perform. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a disability and not eligible to receive Disability Insurance Benefits or Supplemental Security Income.

---

[4] Further citations to social security regulations will identify the pertinent Disability Insurance Benefits regulation with full knowledge of the corresponding Supplemental Security Income regulation.

## IV. Discussion

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the

8

reasons provided by the ALJ. *Id.*

The ALJ placed little weight on Dr. Moore's opinion that Plaintiff would likely miss work more than three times per month. She characterized Dr. Moore's opinion as "speculative at best" and found that "it lacks any support in the medical records." (Doc. #6, *PageID* #51).

Plaintiff finds two flaws in the ALJ's reasoning:

> First and foremost, it is improper for an ALJ to set aside a treating source's medical opinion regarding absenteeism secondary to a characterization of the same as 'speculative,' particularly where the ALJ elsewhere defers to the opinions of non-examiners…. Perhaps more significantly, the ALJ's sweeping assertion that Dr. Moore's absenteeism opinion 'lacks any support in the medical record' is patently false.

(Doc. #7, *PageID* #3327 (citing *PageID* #51; other citation omitted).

A pause here is warranted to recognize that in general vocational experts testify during social-security hearings that there are thousands of jobs available to a hypothetical person with many mental and physical work limitations. The vocational expert in this case did so—as the ALJ recognized—by finding that a hypothetical person with Plaintiff's residual functional capacity for light work with certain limitations the ALJ identified could perform as many 1.2 million jobs in the national economy. (Doc. #6, *PageID* #96). This number drops precipitously, if the hypothetical person would be absent from work two or more times per month. Such absences, according to the vocational expert, left no jobs in the United States he or she could do. *Id.* at 97. This, in turn, means that if Dr. Moore's opinion about Plaintiff's three or more absences from work a month is fully credited, there are no competitive jobs Plaintiff could do, he would be under a disability and eligible for benefits.

9

Consequently, there is much riding on the ALJ's review of Dr. Moore's opinions.

The Commissioner argues that Dr. Moore's opinion about Plaintiff's absenteeism was entirely speculative because Dr. Moore did not explain his opinion or refer to evidence that supported it.

While it is correct that Dr. Moore did not directly explain why he thought Plaintiff would be absent from work more than three times per month, the questionnaire he completed did not ask him to do so. More significantly, Dr. Moore provided much information in the questionnaire that tends to support his conclusion about Plaintiff's likely absenteeism. In light of this information, the ALJ's finding that Dr. Moore was speculating is unreasonable. Dr. Moore reported that Plaintiff's Major Depression is "recurrent, moderate-severe" and that he suffers "constant suicidal ideation, activity limited." *Id*. at 2038. His pain was chronic, a fact that ties into Dr. Moore's later comment that Plaintiff "becomes overwhelmed when he cannot support them [his children] financially and when pain immobilizes him." *Id*. at 2039. On the more positive side, Dr. Moore explained that Plaintiff's recent mental status has improved because he forced himself "into a routine that allows him to play a role in his children's lives." *Id*. at 2039. He reported that Plaintiff is "bright" and "has much to offer …." *Id*. These observations indicate that Dr. Moore was providing an accurate assessment of Plaintiff's mental status, rather than stretching information to help him obtain disability benefits. The information Dr. Moore next discussed went in the other direction. He reported that treatment was aimed at refocusing Plaintiff on others and his potential contributions to them. Dr. Moore also aimed at minimizing Plaintiff helplessness. *Id*. And Dr. Moore recognized, "[Plaintiff] has already

10

attempted suicide once. Will be of particular risk when his kids get older or if he feels he has nothing to contribute." *Id*. Dr. Moore noted that Plaintiff feels ashamed that he has to depend on others. *Id*. All these comments—which precede Dr. Moore's opinion about Plaintiff's absenteeism—demonstrate that Dr. Moore was not merely guessing about Plaintiff's absenteeism. He was instead basing it on his detailed understanding and treatment of Plaintiff for nearly two years. Dr. Moore began treating Plaintiff in December 2014 and continued to do so through the date of the administrative hearing in November 2016. *See id.* at 85, 1996-2037, 2328-59, 3290-93. Additionally, Dr. Moore's opinion that Plaintiff had marked or extreme limitations in six areas of mental-work abilities is likewise supported by the information he provided elsewhere in the questionnaire. *Id*. at 2038-40.

The ALJ's other reason for rejecting Dr. Moore's opinion about Plaintiff's monthly work absences—it "lacks any support in the medical record" ignores or overlooks evidence concerning Plaintiff's constant or frequent suicidal ideation and his repeated need for psychiatric hospitalizations. *Id*. at 402-03, 410-20, 480-86, 713-71, 2315-18, 3277-88. Plaintiff, moreover, could call and obtain an appointment on the same day with Dr. Moore when he needed immediate help with depression and suicidal thoughts. This occurred weekly, according to Plaintiff. He also called the suicide hotline four or five times a month. *Id*. at 91-93.

The ALJ also erred by relying on Dr. Moore's assessment of Plaintiff's Global Assessment of Functioning (GAF) at 65. Dr. Moore's GAF rating of 65 indicated "some mild symptoms…." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th Edition, Text Revision 2000). This, contrary to the ALJ's thinking, is not inconsistent with Dr.

11

Moore's report that Plaintiff's mental status had been improving. (Doc. #6, *PageID* #2039). The GAF scale, moreover, is no longer in use due to "its lack of conceptual clarity (*i.e.*, including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0, J. Am Acad. Psychiatry and Law, 42:2: 173-181 (June 2014) (footnote omitted) (available at http://www.jaapl.org. Search by article title). Given the GAF scale's lack of conceptual clarity and questionable psychometrics, it is too slender a reed to support the ALJ's weighing of Dr. Moore's opinions. *Cf. DeBoard v. Comm'r of Soc. Sec.,* 211 F. App'x 411, 415 (6th Cir. 2006) ("the Commissioner has declined to endorse the [GAF] score for 'use in the Social Security and [Supplemental Security Income] disability programs,' and has indicated that [GAF] scores have no direct correlation to the severity requirements of the mental disorders listings."). The Commissioner points to *Howard v. Comm'r of Soc. Sec*., 276 F.3d 235, 241 (6th Cir. 2002) for the notion that the ALJ was free to cite GAF scores as substantial evidence contradicting Dr. Moore's opinion. *Howard*, however, pre-dated by many years the elimination of the GAF score in DSM-V. Consequently, *Howard's* recognition that "a GAF score may be of considerable help to an ALJ…," *id*., when assessing residual functional capacity is based on outdated information.

The ALJ also discounted Dr. Moore's opinion because he did not include substance abuse in his diagnoses, "an obvious flaw," as the ALJ saw it. (Doc. #6, *PageID* #52). Although there is evidence in the record supporting the existence of Plaintiff's substance abuse, the ALJ did not rely on a medical source opinion to support her medical opinion that

12

Dr. Moore's opinion was obviously flawed for lack of a substance-abuse diagnosis. And there is no indication that Dr. Moore, or any medical source of record, was treating Plaintiff for a substance-abuse. Consequently, the ALJ erred by relying on her own diagnoses of substance-abuse disorder to find Dr. Moore's opinions flawed. *See Simpson v. Comm. of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (citing, in part, *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings[.]")).

The ALJ also placed greater weight on the opinions of record-reviewing psychologist Dr. Steiger and Dr. Voyten than the little weight she placed on Dr. Moore's opinion. Doing so, she parenthetically explained that these record reviewers adopted the previous findings in the decision on November 6, 2012, which denied Plaintiff's previous applications for benefits. The ALJ then merely found that the record reviewers' opinion evidence "appears to more accurately depict the level of limitation actually experienced by [Plaintiff]." (Doc. #6, *PageID* #52). This constitutes error because a "more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[5]

## V. **Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that

---

[5] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

13

shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is strong while contrary evidence is lacking. Plaintiff's long-term treating specialist Dr. Moore's opinions combined with Plaintiff's medical records—showing repeated psychiatric hospitalizations (including a jump or slip from a thirty-foot bridge after calling the police and threatening to jump) and suicidal ideation—and the vocational expert's testimony establishes that there are no jobs in the national economy that Plaintiff can do. He is consequently under a "disability" and eligible for Disability Insurance

14

Benefits and Supplemental Security Income.

## IT IS THEREFORE RECOMMENDED THAT:

1. The Commissioner's non-disability decision on January 30, 2017 be vacated;

2. This matter be remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits; and

3. The case be terminated on the Court's docket.


August 13, 2019					*s/Sharon L. Ovington*
						Sharon L. Ovington
						United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).